IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:08-CV-412-FL(3)

| | | |
|---|---|---|
| KEITH A. LEWIS, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM &** |
| | ) | **RECOMMENDATION** |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the Court upon the parties' cross Motions for Judgment on the

Pleadings. [DE's 11-14]. The time for the parties to file any further responses or replies has

expired. Accordingly, the matter is now ripe for adjudication. Pursuant to 28 U.S.C. 636(b)(1), this

matter is before the undersigned for the entry of a Memorandum and Recommendation. For the

following reasons, it is HEREBY RECOMMENDED that Plaintiff's Motion for Judgment on the

Pleadings [DE-11]be DENIED, that Defendant's Motion for Judgment on the Pleadings [DE-13] be

GRANTED, and that the final decision by Defendant be AFFIRMED.

**Statement of the Case**

Plaintiff filed an application for disability insurance benefits ("DIB") on December 2, 2004

alleging that he has been disabled since October 24, 2003. (Tr. 16). This application was denied

initially and upon reconsideration. (Tr. 16). A hearing was held before an Administrative Law

Judge ("ALJ"), who found Plaintiff was not disabled during the relevant time period in a decision

dated July 26, 2007. (Tr. 16-23). The Social Security Administration's Office of Hearings and

1

Appeals denied Plaintiff's request for review on June 23, 2008, rendering the ALJ's determination as Defendant's final decision.  (Tr. 5-7). Plaintiff filed the instant action on August 22, 2008. [DE-1].

**Standard of Review**

This Court is authorized to review Defendant's denial of benefits under 42 U.S.C. § 405(g), which provides in pertinent part:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive...
> Id.

"Under the Social Security Act, [the Court] must uphold the factual findings of the Secretary if they are supported by substantial evidence and were reached through application of the correct legal standard." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996). "Substantial evidence is ... such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir.1966). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." Craig, 76 F.3d at 589. Thus, this Court's review is limited to determining whether Defendant's finding that Plaintiff was not disabled is "supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir.1990).

**Analysis**

The Social Security Administration has promulgated the following regulations which

establish a sequential evaluation process which must be followed to determine whether a claimant

is entitled to disability benefits:

> The five step analysis begins with the question of whether the claimant engaged in substantial gainful employment. 20 C.F.R. § 404.1520(b). If not, the analysis continues to determine whether, based upon the medical evidence, the claimant has a severe impairment. 20 C.F.R. § 404.1520(c). If the claimed impairment is sufficiently severe, the third step considers whether the claimant has an impairment that equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations. 20 C.F.R. § 404.1520(d); 20 C.F.R. Part 404, subpart P, App.I. If so the claimant is disabled. If not, the next inquiry considers if the impairment prevents the claimant from returning to past work. 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a). If the answer is in the affirmative, the final consideration looks to whether the impairment precludes the claimant from performing other work. 20 C.F.R. § 404.1520(f).
> Mastro v. Apfel, 270 F.3d 171, 177 (4th Cir. 2001).

In the instant action, the ALJ employed the five-step evaluation. First, the ALJ found that

Plaintiff is no longer engaged in substantial gainful employment. (Tr. 18). At step two, the ALJ

found that Plaintiff suffered from the following severe impairments: 1) status post cyst removal on

the right wrist; and 2) status post arthroscopic partial medial meniscectomy for left knee medial

meniscus tear, with post surgical degenerative joint disease. (Tr. 18). In completing step three,

however, the ALJ determined that these impairments were not severe enough to meet or medically

equal one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 18).

The ALJ then proceeded with step four of his analysis and determined that Plaintiff was not

able to perform his past relevant work as a mill operator. (Tr. 22). At step five, the ALJ found that

there were jobs that Plaintiff could perform and that these jobs existed in significant numbers in the

national economy. (Tr. 22). Accordingly, the ALJ determined that Plaintiff was not under a

disability at any time through the date of his decision. (Tr. 22). In making these determinations the

ALJ cited substantial evidence, a summary of which now follows.

On August 5, 1987, Dr. Ward S. Oakley, Jr. indicated that Plaintiff "was unable to work until further notice. Surgery 8-13-87" (Tr. 155). However, on October 26, 1987, Dr. Oakley stated "[Plaintiff] is to attempt to return to his regular job. . . [i]f he is unable to handle his regular stressful job because of recurrence of his ganglion cyst with tendonitis then a job change is strongly recommended." (Tr. 154). Finally, on July 19, 1988, Dr. Oakley stated that Plaintiff should be limited to light duty work for a week. (Tr. 153).

Plaintiff underwent an arthroscopic partial medial meniscectomy on December 12, 2001. (Tr. 159). The surgeon indicated that Plaintiff had been having problems with his left knee for two months. (Tr. 159). Evaluation prior to the surgery indicated that Plaintiff had a complex tear of the posterior medial meniscus. (Tr. 159). No complications were apparent after Plaintiff underwent the procedure. (Tr. 159).

Cumberland Chiropractic Center treated Plaintiff from January 29, 2003 through July 23, 2003. (Tr. 176-195). On January 29, 2003, Plaintiff stated that his pain: 1) prevented him from lifting heavy weights, but he could manage light to medium weights if they were conveniently positioned; 2) did not restrict his walking.; 3) prevented him from sitting more than one hour; and 4) prevented him from standing for longer than one hour. (Tr. 193). However, Plaintiff had no pain while sleeping or traveling. (Tr. 193). Furthermore, on February 10, 2003 it was noted that Plaintiff was feeling better. (Tr. 185). Likewise, on February 14, 2003 Plaintiff stated that he enjoyed his physical therapy. (Tr. 185). Nonetheless, Dr. Douglas Norris indicated that Plaintiff was unable to work from February 14, 2003 through February 21, 2003. (Tr. 187). Treatment notes from March 12, 2003 state that Plaintiff was working and that Plaintiff was feeling much better. (Tr. 184).

4

However, on July 23, 2003, Plaintiff asserted that his pain: 1) was severe and did not vary much; 2) prevented him from sitting and/or standing more than one hour; 3) restricted his social life to his home; and 4) was gradually worsening. (Tr. 179).

The plant physician at the Kelly Springfield Tire Company plant referred Plaintiff for a permanent job change on October 24, 2003 because "no work was available per [Plaintiff's] current restrictions." (Tr. 197).

Dr. James Flanagan examined Plaintiff on November 15, 2001. (Tr. 213). Review of a MRI revealed that Plaintiff had a complex tear of the posterior medial meniscus, although the anterior and posterior cruciate ligaments appeared to be intact. (Tr. 213). Arthroscopic debridement was recommended. (Tr. 213). On January 17, 2002, Dr. Flanagan stated that Plaintiff continued to improve following his left knee arthroscopy. (Tr. 211). Other than some soreness and swelling, Dr. Flanagan opined that Plaintiff was making good progress. (Tr. 211). Likewise, on February 19, 2002, a physician's assistant ("PA") observed that Plaintiff had good range of motion without any difficulty. (Tr. 210). Plaintiff was diagnosed with resolving left knee pain status post arthroscopy. (Tr. 210). Dr. Flanagan again stated on March 21, 2002 that Plaintiff was progressing well. (Tr. 210). Specifically, Plaintiff had full extension flexion and his knee was stable. (Tr. 209-210). Based on this progress, Dr. Flanagan returned Plaintiff to regular duty work on March 25, 2002. (Tr. 209). The PA indicated on May 2, 2002 that "overall, [Plaintiff] is doing relatively well." (Tr. 209). On July 2, 2002, a PA stated that Plaintiff "is steadily making some improvement but still having some intermittent discomfort in the knee." (Tr. 208). A physical examination on that date revealed that Plaintiff had functional motion and minimal tenderness. (Tr. 208). Plaintiff was given a cortisone injection after this examination. (Tr. 208). Dr. Flanagan stated on August 27, 2002 that

5

Plaintiff had full extension with no swelling or effusion. (Tr. 207). In addition, Dr. Flanagan noted that Plaintiff "has actually done quite well since his last visit, and I think at this point, he has reached a level of maximum medical improvement . . . [h]e is still having some mild discomfort, but seems to be working through that fairly well." (Tr. 207). Based on these findings, Dr. Flanagan determined that Plaintiff had sustained a permanent impairment of 9% in his lower extremity. (Tr. 207). Nonetheless, work notes were issued from Dr. Flanagan's office on August 27, 2002 and August 28, 2003 which stated that Plaintiff may return to work without any restrictions. (Tr. 205-206). On August 28, 2003, Plaintiff complained of continuing pain in his left knee. (Tr. 205). However, radiographs did not show any marked degenerative changes or significant collapse. (Tr. 205). Likewise, physical examination revealed that the knee was stable and that Plaintiff was neurovascularly intact. (Tr. 205). Dr. Flanagan referred Plaintiff for another MRI of his left knee. (Tr. 205). Plaintiff again complained of left lower extremity pain on October 7, 2003. (Tr. 203). After his examination of Plaintiff, Dr. Flanagan noted that "review of his x-rays shows no significant evidence of intraarticular pathology." (Tr. 203). Moreover, Dr. Flanagan stated that "I think that the left knee is fine." (Tr. 203). Therefore, on October 8, 2003 Dr. Flanagan's office issued another work note stating that Plaintiff may return to work with no restrictions. (Tr. 202). On October 23, 2003, Dr. Flanagan referred Plaintiff to a specialist to better mange his lower back pain. (Tr. 201). Furthermore, Dr. Flanagan also indicated that Plaintiff could return to work with the following restrictions: 1) standing limited to 10 minutes per hour no longer than six hours per day; 2) no bending and squatting; and 3) no climbing or stair-climbing. (Tr. 214).

With regard to Dr. Flanagan's opinions, the ALJ made the following findings:

> The undersigned has considered, but rejects Dr. Flanagan's opinion that the claimant is only capable of sedentary work . . .Dr. Flanagan's assessment is

6

not well supported by medically acceptable clinical and laboratory diagnostic techniques and it is inconsistent with other substantial medical and nonmedical evidence of record and therefore not entitled to controlling weight.
(Tr. 20).

On May 19, 2004, Plaintiff was examined by Dr. Mark Pomerans. (Tr. 226). During this examination, Plaintiff asserted that "there [was] absolutely nothing he can do." (Tr. 226). However, Plaintiff ambulated normally. (Tr. 228). Although Plaintiff complained of pain in his left hip, he had full range of motion. (Tr. 228). Plaintiff's knee extension was mildly limited by pain but was full. (Tr. 228). Dr. Pomerans diagnosed Plaintiff with: 1) degenerative disc disease of the lumbar spine with chronic strain; and 2) degenerative joint disease with chronic strain in his left knee. (Tr. 228). However, Dr. Pomerans also indicated that Plaintiff could perform the activities of normal living. (Tr. 228). Plaintiff was examined again by Dr. Pomerans on January 3, 2005. (Tr. 220). As before, Plaintiff asserted that "there is nothing that he can do around the house." (Tr. 220). Nonetheless, upon examination Plaintiff demonstrated full motor strength throughout all muscular groups and had no swelling in his left knee. (Tr. 222). Dr. Pomerans repeated his diagnosis of:1) degenerative disc disease and degenerative joint disease. (Tr. 223). Ultimately, Dr. Pomerans reiterated his impression that Plaintiff could perform all activities of normal living. (Tr. 223).

The ALJ determined in his opinion that the findings of Dr. Pomerans' findings were more consistent with the medical evidence of record that Dr. Flanagan's. (Tr. 20).

Plaintiff was treated by Dr. Richard Walker from October 14, 2004 until June 22, 2005. (Tr. 230-239). During this period he underwent a regimen of chiropractic spinal manipulation. (Tr. 235). Throughout this treatment it was noted on several occasions that Plaintiff was doing "okay" or "better". (Tr. 230-239).

7

Dr. Godfrey Fondinka examined Plaintiff on August 3, 2005. (Tr. 241-243). After this examination, Dr. Fondinka made the following findings: 1) Plaintiff did not need an assistive device for ambulation; 2) Plaintiff's ability to handle objects, hear, speak and travel were not impaired; 3) Plaintiff's ability to sit , stand and lift were moderately impaired; and 4) Plaintiff's ability to move about was mildly impaired. (Tr. 243).

With regard to Dr. Fondinka's opinions, the ALJ determined that:

> . . . Dr. Fondinka . . . submitted a detailed report, which included a physical examination, range of motion studies and observations. The undersigned finds that the examination was thorough and consistent with the evidence of record and has given Dr. Fondika's findings considerable weight.
> (Tr. 21).

On May 27, 2004, Dr. Joseph Dykes conducted an assessment of Plaintiff's physical residual functional capacity ("RFC"). (Tr. 256-263). Dr. Dykes determined that Plaintiff could: 1) occasionally lift and/or carry 50 pounds; 2) frequently lift and/or carry 25 pounds; 3) stand and/or walk about six hours in an eight hour workday; and 4) sit for a total of about six hours in an eight hour workday. (Tr. 257). Likewise, Dr. Dykes opined that Plaintiff could frequently climb, balance, stoop, kneel, and crawl. (Tr. 258). Plaintiff was, however, limited to only occasional crouching. (Tr. 258). No manipulative, visual communicative or environmental limitations were noted. (Tr. 259-260).

Another assessment of Plaintiff's RFC was performed by Dr. Robert Gardner on February 21, 2005. (Tr. 248-255). Dr. Gardner determined that Plaintiff could: 1) occasionally lift and/or carry 20 pounds; 2) frequently lift and/or carry 10 pounds; 3) stand and/or walk about six hours in an eight hour workday; and 4) sit for a total of about six hours in an eight hour workday. (Tr. 249). Furthermore, Dr. Gardner noted that Plaintiff could frequently climb, balance, kneel, crouch and

8

crawl.  (Tr. 250).  Plaintiff was, however, limited to only occasional stooping.  (Tr. 250).  No

manipulative, visual communicative or environmental limitations were noted.  (Tr. 251-252).

During the hearing in this matter, Plaintiff testified that he had been unable to work since

October 24, 2003.  (Tr. 272).  Plaintiff stated that he could walk around and perform household

chores for about an hour before needing to rest.  (Tr. 277).  On a typical day, Plaintiff: 1) cooks

breakfast; 2) takes his children to school; 3) washes clothes; 4) vacuums; 5) washes dishes; and 6)

dusts.  (Tr. 277).  He indicated that he was capable of lifting 15-20 pounds.  (Tr. 278).

With regard to Plaintiff's testimony, the ALJ made the following observations:

> After considering the evidence of record, I find that the claimant's medically
> determinable impairments could reasonably be expected to produce the
> alleged symptoms, but that the claimant's statements concerning the
> intensity, persistence and limiting effects of these symptoms are not
> particularly credible . . .
>
> The claimant also has a history of left knee medial meniscal tear requiring
> left knee arthroscopic surgery and partial medial meniscectomy . . . On
> December 12, 2001, the claimant underwent partial medial meniscectomy.
> He had a preoperative diagnosis of left knee medial meniscus tear.  This was
> followed by three months of rehabilitation.  Treatment records reflect that the
> claimant made steady improvement and showed good progress with physical
> therapy.  Treatment notes dates February 19, 2002 state that he was making
> "remarkable improvement."  On August 27, 2002, the claimant's treating
> physician stated that he had reached maximum medical improvement with a
> partial permanent impairment rating of 9% of the left lower extremity.
>
> The claimant was subsequently seen on October 7, 2003 for pain in the lower
> left leg.  X-rays showed no significant evidence of intraarticular pathology.
> The menisci looked to be in good condition, except for the preoperative
> changes.  No large cartilage defects or significant effusion was noted . . .
> (Tr. 20).

In addition, the ALJ made the following finding with regard to Plaintiff's RFC:

> Based on all of the evidence available, the undersigned finds that the
> claimant is able to perform work at the light exertional level.  Light

9

work involves lifting and/or carrying objects weighing up to 10
pounds on a frequent basis; standing and/or walking up to 6 hours in
an eight hour workday, and sitting (with normal breaks) for a total of
up to six hours per eight-hour work day . . .
(Tr. 21-22).

The Court hereby finds that there was substantial evidence to support each of the ALJ's

conclusions. Plaintiff's assignments of error shall now be addressed in turn.

### The ALJ did not err by using the Medical-Vocational Guidelines

Plaintiff first alleges that the ALJ erred by not obtaining the testimony of a vocational expert

to formulate Plaintiff's RFC. In the instant matter, the ALJ used the medical-vocational guidelines

("Grids") to determine that there were jobs in the national economy which Plaintiff could perform.

If a claimant has no nonexertional impairments that prevent him from performing the full range of

work at a given exertional level, the Commissioner may rely solely on the Grids to satisfy his burden

of proof. Coffman v. Bowen, 829 F.2d 514, 518 (4th Cir. 1987); Gory v. Schweiker, 712 F.2d 929,

930-31 (4th Cir. 1983). However, the Grids are dispositive of whether a claimant is disabled only

when the claimant suffers from purely exertional impairments. Aistrop v. Barnhart, 36 Fed. Appx.

145, 146 (4th Cir. 2002)(unpublished opinion). To the extent that nonexertional impairments further

limit the range of jobs available to the claimant, the Grids may not be relied upon to demonstrate

the availability of alternate work activities. Grant v. Schweiker, 699 F.2d 189, 192 (4th Cir. 1983).

Rather, when a claimant suffers from both exertional and nonexertional limitations, the Grids are

not conclusive but may only serve as a guide. Walker v. Bowen, 889 F.2d 47, 49 (4th Cir.

1989)(citing Wilson v. Heckler, 743 F.2d 218 (4th Cir. 1984)). A nonexertional limitation is a

"limitation that is present whether the claimant is attempting to perform the physical requirements

of the job or not . . . [s]uch limitations are present at all times in a claimant's life, whether during

10

exertion or rest."   Woody v. Barnhart, 326 F. Supp.2d 744, 752 (W.D.Va. 2004)(*quoting* Gory 712

F.2d at 930)).  Typically, they are conditions such as mental disorders, environmental intolerances,

substance addictions, or sensory impediments.  *Id.* (*citing* 20 C.F.R. § 1569a, SSR 96-8p; and

Walker, 889 F.2d at 48-49 (4th Cir. 1989)).  Furthermore "[a] non-exertional limitation is one that

places limitations on functioning or restricts an individual from performing a full range of work in

a particular category."  Aistrop, 36 Fed. Appx. at 147(*citing* Gory, 712 F.2d at 930).  However, not

every nonexertional limitation or malady rises to the level of nonexertional impairment, so as to

preclude reliance on the Grids.  Walker, 889 F.2d at 49 (*citing* Grant,699 F.2d at 189).  The proper

inquiry is whether the nonexertional condition affects an individual's RFC to perform work of which

he is exertionally capable.  *Id.*

Here, the ALJ did not limit Plaintiff's RFC based on any non-exertional impairments, finding

that Plaintiff could perform a full range of light work.  (Tr. 21-22).  The Court has already

determined that these findings were supported by substantial evidence in the medical record.

Accordingly, the ALJ was permitted to rely upon the Grids and this assignment of error is meritless.

### The ALJ did not err in evaluating Plaintiff's RFC

Plaintiff next claims that the ALJ erred by failing to abide by SSR 96-8p, which requires the

ALJ to "include a narrative discussion describing how the evidence supports each conclusion."  This

assertion is simply inaccurate.  Contrary to Plaintiff's argument, the ALJ engaged in a lengthy

discussion of the evidence which supported his conclusion that Plaintiff retained the capacity to

perform light work.  (Tr. 18-22).

An individual's RFC is what that person can still do despite physical and mental

impairments.  20 C.F.R. §§ 404.1545, 416.945(a).  RFC is determined at the fourth step of the

11

sequential evaluation process.

This assignment of error essentially highlights evidence the ALJ allegedly "failed" to consider. Plaintiff asks this Court to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of Defendant's. The undersigned declines to do so. The medical record relied upon by the ALJ has already been summarized. This medical record contained substantial evidence to support each of the ALJ's findings, including his assessment of Plaintiff's RFC. Because there is substantial evidence in the record to support the ALJ's RFC determination, this assignment of error is without merit.

**The ALJ accorded proper weight to Plaintiff's treating physician**

Finally, Plaintiff argues that the ALJ's decision to not accord Dr. Flanagan's medical opinion controlling weight constitutes error.

"Although the treating physician rule generally requires a court to accord greater weight to the testimony of a treating physician, the rule does not require that the testimony be given controlling weight." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir.1992) (per curiam). Rather, "a treating physician's opinion on the nature and severity of the claimed impairment is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Mastro, 270 F.3d at 178. Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig, 76 F.3d at 590. In sum, "an ALJ's determination as to the weight to be assigned to a medical opinion will generally not be disturbed absent some indication that the ALJ has dredged up specious inconsistencies or has not given good reason for the weight afforded a particular

12

opinion." <u>Koonce v. Apfel</u>, 166 F.3d 1209 (4th Cir.1999) (unpublished opinion)(internal citations omitted).

In his order, the ALJ explained his reasons for giving Dr. Flanagan's opinion less than controlling weight. The ALJ stated that Dr. Flanagan's opinion was not well supported by medically acceptable clinical and laboratory diagnostic techniques and was inconsistent with other medical evidence. (Tr. 20). This determination by the ALJ was supported by substantial evidence and, therefore, this assignment of error is also meritless.

## Conclusion

For the reasons discussed above, it is HEREBY RECOMMENDED that Plaintiff's Motion for Judgment on the Pleadings [DE-11]be DENIED, that Defendant's Motion for Judgment on the Pleadings [DE-13] be GRANTED, and that the final decision by Defendant be AFFIRMED.

SO RECOMMENDED in Chambers at Raleigh, North Carolina this 4th day of June, 2009.

_____
William A. Webb
U.S. Magistrate Judge